The next case on the calendar is Mr. P. v. Mrs. P. v. West Hartford Board of Education. Thank you. May it please the court, my name is Courtney Spencer. I'm the attorney for the appellants. I'd like to reserve one minute for rebuttal. Your honors, my client is 6'2", 250 pounds. He is psychotic. He has homicidal and suicidal ideation and fantasies of mass killing. As a hearing officer agreed, without constant clinical supervision, he is in danger of hurting or killing someone at all times. Additionally, he has autism and the rigid thinking and social misperceptions that go along with that diagnosis. Therefore, it is very clear that his program, just like any other student with a disability, would need to be highly individualized. It would need to be tailored towards his unique circumstance. So progress would need to be made in light of his circumstances, which are unique and complex. The programs offered by the Board of Education did not meet that standard. Further, as Andrew states, the U.S. Supreme Court has stated that progress does need to be looked at in light of a student's circumstances. And it needs to be ambitious. And just grades and passing from year to year are not sufficient standards for students who are not in special education. And my client was not in regular education. My client was never in regular education, absent a short three-month stint. So the concern is that the hearing officer in district court relied on the wrong standard and looked at the grades and passing from year to year and did not look at his unique needs. As this court stated in Frank G., it is not just academic or educational needs that need to be addressed. It's also social. It's also behavioral management. My client regressed over time. He certainly did not make progress. Even more concerning are the multiple severe and gross procedural violations that were committed by the board that the district court and- Could you just stop for a moment on the substantive standard? Reading your brief, this case differs from a lot of the IDEA cases in that you don't say what was missing in the program was the addition of an additional paraprofessional or a different student-teacher ratio or a smaller class. There seemed to have been agreement that it was ideal for the student to, to the extent possible, go to the local high school and have a supplemental program and then to transition to the local high school so that the student could be integrated with the student's peers to the extent possible. What I don't see in terms of the denial of the substantive FAPE is what you are saying that they should have done and they didn't do. Plainly, there were mistakes because the student then had to be removed from the high school. What I don't see are the specifics that should have been offered to the child and were not, first. Second, why the progress in this case was, in fact, insufficient progress. The student did get good grades. The student did pass the state test. Why wasn't that sufficient progress to meet the Supreme Court's recent standard? Okay, to the first question, I do believe I do set forth the board. This was, outside of mental health, this was a student with autism. The board acknowledged he had autism and he had social skill deficits and never once addressed it in his IEP. He never had social skills, goals, or objectives. Further, the board listed his specific mental health needs, threatening to blow up and kill people in the school, fixation on violence, rigid thinking, fantasies, and paranoid delusions. The IEP never addressed any of those things. We believe the program they put him in, the STRIVE program, confined him, did not provide appropriate academics, did not provide appropriate intervention. We can see that as they tried for a very short period of time to integrate him for a half day in the mainstream and he couldn't even do that. We also think that's in large part to failing to actually tell the staff who was coming and what his needs were, but clearly the program did not prepare him for anything, as evidenced by what occurred, but also that was in place beforehand. And then if you look at his senior year, and keep in mind, the board wanted to graduate him. After he failed at hall and confronted the guidance counselor, the board's response was, okay, well, you have enough credits to graduate. This is a mentally ill young man. His category is emotional disturbance, so progress would need to be made in that area of emotional and mental health. In his 12th grade year, he punched a student so hard he broke his hand on his face. The board didn't consider that a significant issue. They belittle it and downplay it in their brief. And then at the very end of his senior year, he was skipping classes, getting more depressed, as acknowledged by board staff. When his mother asked him what was going on, he took a knife, ran out of his house to kill his former psychiatrist because what was happening at school was causing such hopelessness in him. Clearly, if you're looking at mental health and emotional disturbance, no progress was made. Further, he has 136 verbal IQ. He's in a very segregated program where he's filling out worksheets, and he's repeating classes over and over because they don't have enough classes or teachers. So looking at his grades, I think that's why the Supreme Court said, if a student's not in regular ed, you can't look to grades as the measure because the curriculum's going to be different, the expectations are going to be different, and they were far below what my client needed. Can you address the child fine provisions in particular? Because I don't believe our circuit has talked about those in published case law, and you argue that there is a procedural violation with regard to the school's board's conduct. Yes. Yes, Your Honor. Yes, as of November, the board was aware that my client had declining grades. He was hospitalized for suicidal threats in December and admitted to at one point having brought a knife to school. He then was failing his classes in January. He was then readmitted to a psychiatric hospital for threatening to blow up the hospital and kill his psychiatrist. The board was aware in November and December that grades are decreasing, the psychiatric issues are increasing. They've never referred him for special education. My client referred him. And there's an argument about the long period of time for eligibility, but that does not apply to evaluation. You have to evaluate the minute you have a child who you suspect could be a child with a disability. So that was invoked in November and December. So my client refers no evaluation, certainly no eligibility, and has to re-refer. Help me understand the timeline, because he is deemed eligible for special education by June. Yes. So we're talking about the period from November, December to June, and the record is replete with meetings and consultations and discussions during that period. What did they not do early enough? The concern is from November to June, and particularly as of January, my client missed half a year of school. It was four years of high school. He missed an entire half of a year. He was getting nominal homebound tutoring below even the statutory minimum. So having meetings is great, but what's the point? The point was to get my client remediation. And as we look at his progress over time, which declined in his area of emotional disturbance, which is his category, they weren't addressing that. So you can meet with the parents, but if you're not providing the clinical support, the intervention, the goals and objectives, there will be no progress. So to say he should have sat there for six months, getting progressively worse to the point where he couldn't attend school, and then find him eligible I think sets a very dangerous standard. I think to uphold the district court's decision sets a very low standard. It will actually decrease the rights of students with disabilities. Don't we have to start the clock in March rather than in November or December, or March of 2012 with the beginning of the statute of limitations? Yes, Your Honor. Isn't the period that you're looking at what was the procedural violation from March to June when the child was eligible for special ed? Yes, Your Honor, but we believe as of March he would have been found eligible under the statute. So from March to June, and again, but for the parents, he would have never been found eligible because they had to re-refer him in April. So we believe it's an egregious. It seems that there was a psychiatric consult and a psychological evaluation in May, at least the hearing officer so concluded. So it does seem that they were looking at these issues that you've talked about. Yes, Your Honor, but the parent referred, the parent requested. Actually, the parent had already requested evaluations in advance of that and were denied. But regardless of who requested it, they were addressing these issues, it seems. And the psychological evaluation from the board said he should be found eligible, and at a subsequent PPT they still denied him in May. So their own staff is saying this is a child who should be found eligible. And I realize it sounds like, okay, one month, three months, five months, but this is a young man with psychosis and homicidal ideation. This is his whole future. That period of time was significant and a significant denial of faith. Thank you, Your Honors. May it please the Court, my name is Susan Friedman, and I represent the West Hartford, Connecticut Board of Education. I'm here today to ask this Court to look carefully at the record before you, as the hearing officer did and as the district court did. It's not exactly as it's been portrayed today and also in the parent's briefs. Contrary to the parent's description of this student, he is, without doubt, a very bright and capable student who has social and emotional problems. I believe counsel misspoke when she said that he had never been in regular education because he was a regular education student from first grade through ninth grade, receiving regular grades without any kind of specialized services. It was not until ninth grade that he began to exhibit difficulties in school, and that was when he was in the Hall High School, the regular high school in West Hartford. The record also demonstrates that, as Your Honor noted, that the statute of limitations begins in March of 2012. However, that was not the first time the board was involved in trying to work with the student and the parent in terms of providing services. By the way, by the same token, you criticized your opponent for stressing some things in the record, but I read your brief and don't find any references to homicidal, suicidal ideation. I don't find any reference to the incident of running out of the house with the knife. And are we just supposed to ignore all of that? Don't you think it would have been better to attempt to put those incidents into some context for us rather than to leave us wondering about what the board and what the IEPs did to assure that a student with those problems was dealt with in an appropriate way? How can we do that when your brief doesn't even mention the issues? Well, Your Honor, and I'm sorry if we did not give you sufficient information, but the reality of this was that each of the hospitalizations for this student were at home. None of them were from the school. We met with the parents when we had the first hospitalization, when we got the notice of that. We met with the parents in a child study program, which is the first regular ed intervention that schools under the IDEA are supposed to attempt regular ed interventions first before jumping to finding a student eligible under a very difficult and somewhat threatening or compromising eligibility of emotional disturbance. We did not have those events within the school setting other than one isolated incident where there was a fight, and that was the only incident of any kind of aggression that we had in the school setting. Now, that doesn't mean that we don't take seriously— I'm sorry, but doesn't the IEP have to address that, and don't we have to consider that when we're determining whether a FAPE was provided to the child? Absolutely, Your Honor, and what we did do with that was that when we heard that the child had been hospitalized, we immediately asked for the discharge summary from the hospital. We had a meeting in the school. We got the discharge summary, which said that the student was safe to return to the high school program. That was the hospitalization discharge summary. The only other information that we had was the parent said that her child had been diagnosed with ADHD, attention deficit hyperactivity disorder. So at the time that the school met at Section 504 of the Rehabilitation Act and found the student eligible, we were finding him eligible under the only diagnosis that had been given at that time, and with a statement from his psychiatrist that he should be placed on homebound tutoring, which the school had already done prior to having that request. During that time of the homebound tutoring, we also met with the parent in March, where the parents asked for us to diagnose him at that time, to evaluate and find him eligible immediately as emotionally disturbed. At that moment in time, the parents indicated that his medication, he was responding well to his medication, and that he was having more success with his tutoring. So the district, again, increased his tutoring and said that at this point in time, we are not going to evaluate him for eligibility under special education, but we are going to have another meeting in April, so that we can be sure to see how he's doing and to monitor his progress. It was not just that we were waiting and sitting on our hands, because you don't want to find a student eligible as emotionally disturbed under a short period of time. The guidelines of Connecticut, the state of Connecticut, and the guidelines and the definition of emotional disturbance requires that a student has an emotional disturbance that disrupts his ability to access his educational progress, social and emotional progress, over a long period of time. In fact, the recommendation under the Connecticut standard is six months. We then, in April, made the determination that we would evaluate. A psychiatrist did a consultation, including the parents, the student, the people that knew him from school. We did a psychological evaluation also. The parents filled out rating forms. The people that were working with him filled out rating forms. We used a wide variety of standards and evaluations in order to determine, did he, in fact, meet that standard of emotional disturbance? And, in fact, we continued to have PPTs. It was five PPTs over that period at very close amounts of time, where we were considering all the information that we were given, and we ultimately did find him eligible within the 60-day period that the IDEA requires for you to find a student eligible. When the child was returned to high school on a full-time basis in his senior year, for a brief period of time, it didn't work out. Before the child was returned, was a psychological study done to assure that it was safe for the child to return to school? Well, Your Honor, when the decision was made to return him to school, he had already participated in a year and a half of the West Hartford STRIVE program, which is a very specialized program. My question, the concern in the record is whether a child with homicidal or suicidal ideations is returned to the high school. You already said that there was a psychological study done to assure safety when the child came out of the hospital earlier. My question is, was a study done to say that it was safe for the child to return to the high school? Yes, during the time that he was in the STRIVE program. The program itself has a behavioral program where the student, every day, there was an approach to the behaviors. Was he able to meet the standards of being in a small, it was still a public high school, but it was a small setting, and was he able to complete his academic work? During that program, during his junior year and most of his senior year, he was participating in field trips with that group.  He was a participant in the wrestling team of the high school, because this program is located closely there, without a one-to-one paraprofessional, without anybody saying that they needed to keep him in close contact. He was doing all of that successfully, very successfully. Was a psychological analysis done to assure that the child could return safely to the high school? We did not do a separate psychological. We met as a PPT. The parent agreed that she felt that he was ready to try a half day at the high school and have a half day back at the STRIVE program where he had social workers, he had counselors, and he had been very successful. All of us, the entire team, nobody disagreed, because we were trying to give him the opportunity to go to school in the least restrictive environment. The standard that the district court applied, consistent with what this court has applied, was the court judged the substantive program under a standard of whether the IEP affords the student with an opportunity greater than mere trivial advancement. That's consistent with some of the cases from this court. Isn't that standard outdated now under Andrew F.? Isn't more than mere trivial advancement the same as more than a de minimis advancement? I believe, Your Honor, that the Second Circuit has always had a standard that requires far more than a de minimis standard. It goes back as far as 1997 with Mrs. M. My only question was the standard expressed by the district court, which appears to be consistent with this court, is afford the student with an opportunity greater than mere trivial advancement. Isn't greater than mere trivial advancement the same as greater than de minimis advancement? Well, I don't believe that that's the standard that this court should be considering, because I do believe that the Second Circuit has always required . . . But that's what the district court said. If you look at the child, the standard that was applied by the hearing officer was that the district, that the student had to make . . . we had to have offered an IEP that allowed the student to make . . . that was reasonably calculated to allow the student to make progress in light of his . . . in light of the child's needs. In other words, it was always more than simply de minimis. And certainly the facts in this record show and demonstrate clearly that this student was a very successful student. He went into that STRIVE program. He was able to academically complete all the credits that he required to graduate from high school. He was able to pass a statewide standardized test that is required of all high school students . . . with the only accommodation being that he was able to take it in a separate room, rather than in a large room. He clearly was able to go on field trips, become part of the wrestling team, a member of the wrestling team. He was successful in that. He displayed one behavioral issue during that whole period of time. And immediately after the punch, he immediately listened to what the school staff asked him to do. He had to be disciplined because no one would allow that to occur without discipline. He was able to return to the STRIVE program and then again achieve the highest level of behavioral actions . . . and social and emotional actions within this program. From the district's perspective, I'm sorry, can I continue? From the district's perspective, we saw him and I believe even the parent admitted on the record . . . that he did make educational, social and academic progress in the STRIVE program. What this is all about is a difference of opinion between the district and the parent . . . about what post-transition program he should attend. That's what this is about. Can I ask, and we've tread over this ground a little bit, so I'll just ask briefly. But, referring again back to the beginning period, I am troubled and I realize there's a statute of limitations . . . a statute problem, but during this period from December to June, the school . . . it may not have happened at school, but the school is aware that his grades are plummeting . . . that there are difficult home problems, a pattern of disengagement and I'm wondering why this . . . that a child find obligation wouldn't kick in to say we need to have some sort of psychological evaluation . . . giving some indications of behavioral problems earlier than happened. And, I understand your concern. It needs to be a long period of time, longer period of time. We don't want to rush this process. But, what in the record assures me that the process was done with reasonable dispatch . . . when you had the parents apparently pushing for more during this period? The hearing officer took note of the fact that information and testimony about the earlier . . . that earlier period would be permitted in the hearing and was permitted in the hearing . . . But, it's not correct that the board did not take any action. First of all, we did not have notice in November of any kind of . . . that was prior to any hospitalization and prior to any opportunity for the board to see . . . that this was a serious issue other than a student, you know, not doing well in grade . . . in terms of his grades. But, there was no . . . there were no adverse issues within the school setting. No aggression, nothing like that. December, when the parents notified the school that the student had been hospitalized . . . was the first notice that the district got. And, we met in January at what is the normal process would be a child find meeting . . . which is an informal meeting with the teachers, with the counselors in the school setting . . . Then, the parents, you know, and the parents are part of . . . not necessarily part of that, but are part of the process. And, that was at the point where we were looking for information from what the hospital was saying . . . and giving him the opportunity to . . . we cut back on his class, on his workload. You know, that's the normal process that a high school would use or any school would use . . . to try to ease up on what was happening and try to understand where we were going with that. And then, we received the discharge summary, which said that he was able to return safely . . . could return to the school. But, we didn't just leave it there. We met again at a Section 504 meeting, which has the, you know, legal ramifications . . . involves the parent, set up an accommodation plan where we were giving tutoring to the student. We were monitoring him closely. And then, in March, during that period, his tutoring was increased because there was . . . you know, and I have to say, there was a problem with the tutor, in the sense of . . . and his eligible . . . and his time frame. And, there was . . . we were not getting as much tutoring as we could. So, we made that up with a compensatory tutoring, throughout the rest of the year and over the summer . . . in order to allow him to complete his credits for that year, which he did successfully. So, and then we went to the March PPT, where the parents asked us to find him eligible to do evaluations. And, at that point, he was showing success on the lesser . . . under these accommodations. He was showing success on his medication. He was cooperating with the tutor. He was academically being able to complete his work. So, you don't . . . you know, a school doesn't want to take the . . . to jump to an emotional . . . to decide that a student is someone who is socially, seriously, emotionally disturbed . . . is the name of the eligibility. And, Congress has told us not to use the name, seriously, when we're describing it as a student. We call them ED students, because they were concerned about the impact of calling someone seriously, emotionally disturbed. We have students, many times, that have a hospitalization . . . have a period of time, where they're having a difficult time in school . . . and then are able to work out, you know, to handle it and to do what they needed to do . . . without us having to find them ED. In this case, the next PPT, we said we're going to meet again. And, the next PPT was the PPT we determined eligibility. So, I believe and I think the District Court made the statement that we were not ignoring the student. We were not just, you know, putting aside the parent's concerns. We were meeting regularly through that whole period of time . . . and in contact with that student, through the whole period of time. And, the recommendation of STRIVE . . . It's a program designed for students, who are academically capable students . . . who, for social and emotional reasons, can't handle a large high school program. Thank you. Thank you. Just to clarify, Attorney Friedman is correct. He . . . I was referencing the statutory period when he was not in regular education . . . the period in front of this court. Just quickly, the June IEP from 2012 noted the school was aware as of November of that year . . . that he was experiencing psychiatric difficulties, impairing his ability to attend school. In December, the parent disclosed to the school district that he had been suicidal . . . and taking a knife to school to protect himself. The school was fully aware of all of this information. Again, the district court standard of monitoring and having meetings is not the child find. Child find does not carve out an exception for 504 and it does not say . . . Is it your position that the district court applied the wrong standard? Yes. Your brief was submitted before Andrew F. . . and the district court did not have the benefit of Andrew F. . . I mean, does Andrew F. . . suggest a different analysis that the district court should have engaged in? Yes, Your Honor. They did . . . The district court did say more than mere trivial advancement. Andrew says it's markedly more than de minimis, which is the same. So, it is a very different standard. The district court did have the LO standard and did not consider the cumulative violations of procedural violations as well. So, they did have that and chose to ignore this court's well established . . . The counsel suggests that Andrew F. . . really doesn't change what we've been applying all along. What is your view of that argument? I think it's a marked difference. I think it's significant. So, more than mere trivial advancement is nothing. You know, basically, yes. You can get A's and B's. You show up for school. The Supreme Court is very clear that was never what they intended to set forth. That certainly . . . That has to be ambitious and progress must be made in light of the child's circumstances. Clearly, IDEA is not just an act of futility. It should have teeth and meaning. And, the Supreme Court is very clear. They expect children to make progress. All children . . . All children with disabilities. And, that would include mental health. But, we would have to review the record de novo, applying the standard of Andrew F. . . of the IEP, right? I mean, the fact that the district court may have set out a wrong standard is not dispos . . . We have to review it under the standard of Andrew F., right? I believe so, Your Honor. I have to be honest. I'm not sure. Okay. I do think . . . The other point in this case is most of the facts are not in dispute. So, it's not . . . You know, you're not challenging their factual finding. I think they were minimized, but not in dispute. Thank you, Your Honors. Thank you, both. Well argued.